The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>BERNARD ROSS HANSEN and<br>DIANE RENEE ERDMANN,<br><br>Defendants. | NO. CR18-092 RAJ<br><br>**TRIAL BRIEF**<br><br>**Trial Date:** July 6, 2021 |

## I.     INTRODUCTION

Defendants Ross Hansen and Diane Erdmann are charged with mail fraud and wire fraud. The charges arise out of defendants' scheme to defraud customers of Northwest Territorial Mint (NWTM), a precious metals business based in Federal Way, Washington, through a series of misrepresentations about the delivery timing and availability of bullion ordered by customers and availability of refunds when those orders were not sent—misrepresentations designed to obtain and keep customer money. Despite giving customers a certain delivery deadline for their orders, Hansen (the President and CEO) and Erdmann (the vault manager) knew that those orders would not be fulfilled on time (if at all) when they took customer money, then explained away the continued delays with more lies as complaints mounted. As NWTM was behind in fulfilling its bullion customer orders, Hansen and Erdmann also used customer-owned bullion,

1  represented to be securely stored in NWTM's vaults for a fee, to fulfill new customer
2  orders. In other instances, Hansen and Erdmann and used customers' money for other
3  expenses.

4      The twenty-count Indictment charges Hansen and Erdmann with mail fraud and
5  wire fraud. Trial is scheduled for July 6, 2021. The government expects to call fifty to
6  sixty witnesses and expects that its case in chief will last approximately three weeks.

7              **II.      BACKGROUND AND SUMMARY OF EVIDENCE**

8      The government will present evidence of the following facts at trial:

9  **A. NWTM Business, Attorney General Consent Decree**

10     Founded in the 1980s, NWTM had multiple lines of business, including a custom
11 business that manufactured awards, coins, and medallions, and a bullion business—the
12 focus of this case—that involved the sale, purchase, and exchange of "bullion" (bulk
13 precious metals), primarily silver and gold.

14     Most of NWTM's bullion sales were to customers for later delivery, referred to
15 herein as a "standard bullion customer." Standard bullion customers could place orders
16 via the NWTM website or by calling NWTM and speaking with a sales representative.
17 Standard bullion customers were required to pay for their orders by cash, wire transfer or
18 check to the NWTM. These orders included precious metals from various government
19 mints, as well as silver manufactured and minted by NWTM in its facility in Dayton,
20 Nevada. Standard bullion customers were promised delivery at a future date, usually 8-10
21 weeks after payment clearance.

22     Many customers also needed a secure storage place for their bullion, so Hansen
23 directed NWTM to offer a bullion-storage service. NWTM/Hansen promised to securely
24 store bullion for its customers in NWTM vaults for a yearly fee. Hansen also offered a
25 "lease" program for selected customers, and Hansen would pay annual interest in like-
26 kind metal to customers who would "lease" their gold and silver bullion for use in
27 NWTM's business operations.

28

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 2

By the 2000s, customers repeatedly complained about long delays in fulfilling bullion orders. In 2008, the Washington Attorney General's Office (AGO) filed a Consumer Protection complaint against NWTM and Hansen. The AGO Complaint accused NWTM and Hansen of unfair business practices, including serially misrepresenting delivery dates. Later in 2008, the parties settled the case and Hansen signed a Consent Decree. The Consent Decree restrained NWTM from representing to customers that it had the ability to ship metal by a certain date unless there was a reasonable basis for making the representation.[1] The Consent Decree also required NWTM: 1) to tell bullion customers a specific delivery date (otherwise shipment was required within 30 days of order); 2) to timely notify the bullion customer when NWTM learned it could not meet that delivery date; and 3) to ship bullion within 30 additional days of the delivery date. If NTWM could not ship within that later window, the Consent Decree required NWTM to provide the bullion customer an immediate refund.

**B. NWTM Bullion, Bullion Storage, and Bullion Lease Business 2008-2016**

Hansen was the founder, president and CEO of NWTM, and former employees will testify he was involved in, and had final decision-making authority in, nearly every aspect of the business. Hansen decided how money was spent at NWTM and, in particular, he decided when to purchase raw materials to fulfill bullion orders. Hansen decided at what price to sell bullion, and how to advertise bullion for sale. Erdmann was the Vault Manager. In this role, Erdmann decided how to allocate the raw material that came into NWTM and decided what bullion orders were fulfilled and in what priority. Also, during all relevant times, Hansen and Erdmann lived together.

Despite the Consent Decree entered in 2008, Hansen and Erdmann continued to delay standard customer orders, i.e., the larger bullion orders (typically more than $1000)—promising one delivery date, and then consistently extending the delivery

---

[1] Under the Consent Decree, the specified shipping period was to be based on the average number of days it had taken NWTM to deliver similar goods in the past, as calculated by the prior year's delivery data.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

window at least another 30 days—throughout 2011, 2012, and 2013. This prompted another AGO investigation. The AGO served a civil investigative demand on NWTM in 2014 for delayed order data. The data NWTM provided the AGO in response showed that nearly 40,000 orders since 2010 had been delayed past the promised delivery date.

In late 2014, the AGO referred this matter to the FBI for criminal investigation. That investigation showed—and the government will prove at trial—that in the years prior to its April 2016 bankruptcy, Hansen and Erdmann ran NWTM as a Ponzi-like fraud. As NWTM struggled to acquire raw metal and fell behind in filling orders, the business required new bullion customer money to fulfill old bullion customer orders. Erdmann and Hansen used some of the bullion-storage program bullion to fulfill new bullion orders. The defendants similarly used so-called leased metal to fulfill new bullion orders and failed to account for the customers' interest and replenish their metal. Hansen further used payments for new orders to fill older, outstanding orders and keep the scheme going.

To get this new customer money, Hansen lured standard bullion customers to NWTM by low pricing and required that his employees promise delivery of their orders within 8-10 weeks, and further required that the customers were promised refunds at any time after the additional, 30-day period elapsed. In fact, Erdmann was regularly shipping standard bullion customer orders after 16-20 weeks. Refunds, required to be immediate under the Consent Decree, were also delayed weeks and months.

**C. Bankruptcy**

In February 2016, a jury awarded Bradley Cohen, NWTM's former landlord, over $37 million in damages in a lawsuit Cohen brought against Hansen and NWTM. The judgment, apportioned between Hansen ($25 million) and NWTM ($12 million), was announced in open court on February 17, 2016, and entered on March 1, 2016.[2]

---

[2] The government believes that the fact of the lawsuit, the judgment, and its timing are admissible without eliciting the details of the suit. The fact and timing of the judgment is necessary to tell the complete story in this case: the judgment was communicated to victims as a purported reason NWTM could not fulfill their orders, and the judgment's timing helps explain why NWTM filed bankruptcy when it did.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 4

On April 1, 2016, Hansen caused NWTM to file for Chapter 11 re-organization bankruptcy, ostensibly to protect it from the Cohen verdict. Hansen initially requested that he stay in control of NWTM during bankruptcy and requested that the Court appoint a restructuring specialist. Instead, the Court appointed a Trustee, and shortly thereafter, Hansen and Erdmann stopped working at NWTM. After bankruptcy, the metals stored in NWTM's Federal Way, Auburn, and Nevada vaults were inventoried, and outstanding bullion orders were reviewed. Based on this review, at the time it went into bankruptcy, NWTM had collected money for roughly $25 million in outstanding bullion orders that had not been delivered and/or refunds that had been requested but not honored. Further, the NWTM vaults were missing approximately $5 million in bullion that Hansen and Erdmann represented that NWTM was securely storing for customers, and lease obligations of roughly $5 million more. At the time of bankruptcy, NWTM had insufficient money or bullion to pay these customers.

**D. Defendants' Scheme to Defraud NWTM Customers**

Prior to 2012, Hansen dramatically expanded the NWTM business footprint by acquiring two other medal businesses. In 2009, Hansen used $2 million of NWTM money to acquire a mint in Nevada. Hansen moved the minting operations from Washington to Nevada at this time. In 2011, Hansen used more than $3 million in NWTM funds to acquire a medal business in Texas. Those funds came, at least in part, from bullion customer funds those customers intended to be used to purchase their ordered precious metal; instead, those funds were comingled with all other NWTM accounts and used however Hansen saw fit at any given time.

Hansen and Erdmann knew that in 2012-2013, following these large expenditures, orders were taking longer than promised to fulfill. Further, starting in 2011 and continuing to 2016, Hansen directed his financial employees not to file taxes and not to prepare financial statements because, he told them, you do not file taxes when you are losing money. Hansen told employees that NWTM had cash flow problems. He told former CFO John Young that he had a plan to fix the problems, but "I'll tell you when

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  you need to know." Other witnesses will testify that Hansen told them he knew that
2  NWTM was "running at a loss."

3      Despite the fact that NWTM was losing money and required additional customer
4  money to fulfill old orders, Hansen and Erdmann continued to run the business. In order
5  to keep it running, they defrauded NWTM's customers; they defrauded their standard
6  bullion customers, by soliciting these customers with false promises as to delivery dates
7  and the availability of refunds – all in violation of the AGO Consent Decree. They also
8  defrauded the bullion storage and lease customers, whose money and bullion were being
9  used to fulfill new orders and were not being replenished.

10  **1. BULLION PROGRAM**

11      **a. Fraud in standard bullion customer orders -- misrepresentations**
12         **regarding bullion delivery dates**

13      As discussed above, as the company got more and more behind, the amount of
14  time that it took fulfill standard bullion customer orders increased, and by 2015, the
15  situation was dire. To keep money coming, Hansen and Erdmann misrepresented the time
16  it would take to fulfill standard bullion customer orders, how they would be filled, and
17  why they were continually delayed, among other things.

18      This started at the time of purchase, where, at Hansen's direction, NWTM sales
19  employees told these customers that orders would be fulfilled in 8-10 weeks; those
20  purchases confirmed with an email stating that orders would be shipped "promptly."
21  After the customer's payment was received, NWTM employees again sent emails giving
22  a specific delivery window that was 10 weeks away. However, sales and customer
23  service representatives will testify that by 2015, the vast majority of standard bullion
24  customer orders were not being fulfilled within 10 weeks. These employees will testify
25  that they asked about giving more "realistic" lead times to customers, but Hansen did not
26  want to, and representatives feared discipline or termination if they defied his directives.

27      Hansen and Erdmann would not even consider fulfilling most standard bullion
28  customer orders until the end of the 10-week period. Late on the last day of the 10-week

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

period, almost all customers in 2015-2016 received delay emails from NWTM that said their orders would be delayed up an additional 30 days. The emails typically stated, "due to unprecedented high volume of orders we have in line for shipping it appears that we may not meet our original shipping date." These emails themselves were another lie; NWTM had been sending the same "unprecedented" emails since at least 2010. Customer service representatives generated these emails on the last Friday that the 10-week window expired. At the same time the delay emails were generated, NWTM employees created a list of how much gold and silver would be needed to fulfill these delayed orders and gave that list to Hansen and Erdmann.

The Consent Decree required that NWTM fulfill all bullion customer orders within 30 days of any delay notice, or else NWTM had to provide a refund. So NWTM employees called these bullion customer orders that received a 30-day delay notice "drop dead" orders because it now needed to be fulfilled within the next 30 days. The government will introduce at trial lists of "drop dead" orders Erdmann sent to NWTM bullion production staff in Nevada. By 2014, bullion production employees worked all weekend to get bullion orders ready to ship on what they called "Drop Dead Monday." Even still, numerous orders in 2015 were not fulfilled in this time. It was clear to Hansen and Erdmann that the 10-week delivery date was a lie; throughout at least 2014 and 2015 (and likely before), bullion delivery orders were months behind. Erdmann, in particular, was responsible for fulfilling orders – she knew that the orders she was filling were typically far past their "drop dead" date.

Some orders were timely filled, but according to NWTM employees, those orders were typically smaller orders rather than larger orders that were so-called "drop dead" orders, which were usually delayed not only past the 10 weeks promised, but beyond the 30-day delay window as well. An FBI case agent who reviewed NWTM's "delayed" and "on-time" order date from April 1, 2014 through March 31, 2016 will testify that of more

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

than 12,000 bullion orders,[3] only 518 were filled within the represented shipping window, and 2,100 more were filled within the 30-day delay window. The rest were either filled beyond 30 days (roughly 6,200 orders) or never fulfilled (3,300 orders). Despite representing to customers that orders were filled in the order of payment , as discussed below, former bullion department employees will testify that Hansen and Erdmann would prioritize filling orders when the customer threatened to complain to various authorities, like the Better Business Bureau (BBB) or the Attorney General. Emails corroborate those accounts; after customer service representatives like Kim Neff and Samantha Blizard would relay customer threats to Erdmann, she would routinely respond that those customer orders could be shipped in short order.

### b. Misrepresentations regarding use of customer funds

At the time NWTM accepted orders, Hansen and Erdmann knew that NWTM needed new money in order to meet its old obligations. (Hansen was checking the bank account balances and obligations information three times a day.) Multiple employees will testify that they knew NWTM was "robbing Peter to pay Paul." Instead of disclosing this to customers, however, NWTM sent emails that made customers believe that their money would be used to fulfill their particular order. After their orders were placed, but before NWTM received customer money, NWTM sent the customers email receipts that described the transactions as a "trade" of money for precious metal. Standard bullion customers who never received their ordered metal will testify at trial that they understood their payment would be used to purchase their metal, not to fill older orders or to pay unrelated business expenses. After they had paid their money, but before receiving their orders, inquiring customers sometimes received emails from NWTM that were drafted at Hansen's direction and that reinforced customers' mistaken belief that their money would be used for their order by misrepresenting the way NWTM fulfilled orders:

---

[3] Over $1000, without notes indicating credit card payment or 14-21 day delivery window used for credit card sales.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

- "We operate as a brokerage – we buy to fill orders. As you lock in a price and pay for your order we contract for the metals."

- NWTM fulfilled orders "in the order of payment clearance."

Hansen told other witnesses, and testified at the bankruptcy creditors meeting, that NWTM's business model was to "batch" orders. Instead, Hansen commingled customer money in NWTM's general account and used it indiscriminately to expand the business, pay attorney fees, provide for Hansen and Erdmann's personal expenses, and to buy metal to fulfill older customer orders. During this time, he was not batching orders – he was simply buying as much raw material as NWTM could afford.

### c. Misrepresentations regarding customer refunds

According to the Consent Decree, NWTM was required to tell bullion customers they could liquidate their order prior to the promised delivery date. The Consent Decree further required that if NWTM did not meet the promised delivery date, NWTM must provide customers with a refund. NWTM employees made these representations to employees in emails sent to standard bullion customers at the time of their purchase.

However, in 2015 and 2016, Hansen and Erdmann delayed refunds in several ways. When an order went beyond the "drop dead" date, NWTM did not contact customers to offer a refund, but waited until the customer made contact instead. Hansen directed employees to try to talk bullion customers (who had already waited months for their order) out of refunds by offering additional free bullion. If metal prices had gone down, Hansen directed NWTM to promote a "repurchase," where the customers would use the same money paid months before to purchase a larger quantity of metal, resetting the delivery timetable for that customer. When a customer persisted, Erdmann prioritized the refunds of customers who threatened to report NWTM to BBB or AGO.

Hansen and Erdmann also had employees tell lies to customers seeking refunds, including that a refund payment would take 4-6 weeks to "process," or that a refund check had already been sent or was lost in the mail (when it had never been mailed in the first place), buying time for new money to come in. Hansen controlled when the refunds

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

were actually sent; he told reviewed the NWTM bank accounts daily and told the NWTM accountant that only, for example, $50,000 worth of refunds could be sent out in a particular day, regardless of how many multiples of that amount was owed to waiting customers.

## 2. STORAGE PROGRAM

### a. The bullion-storage program promised security

Because many bullion customers viewed bullion as an investment, Hansen caused NWTM to offer to store precious metals for bullion customers for a fee. Hansen and NWTM customers signed storage contracts that stated that:

- NWTM would "provide secure storage for [specific customer-owned] bullion";

- Upon termination with 30 days' notice, "NWTM will ship Your bullion to the last known address on NWTM's records";

- "You may liquidate [convert into cash] stored bullion, in whole or in part, at any time by calling NWTM during normal business hours … and payment shall be made to You within thirty (30) days thereafter";

- Bullion-storage customers "may inspect Your stored bullion at any time during NWTM's normal business hours upon reasonable notice of at least 2 business days"; and

- "NWTM is required to maintain sufficient coverage at all times to cover all stored bullion at full replacement value at any prevailing market rate."

Between 2008 and 2013, dozens of individuals became bullion storage customers, both by physically delivering bullion to NWTM and by ordering bullion and, instead of taking delivery, requesting that NWTM store it for them. Initially, all bullion was stored in Washington. Around 2009, a former NWTM employee took an inventory of stored bullion in Washington and identified all expected customer-owned bullion. After 2009, some bullion-storage was located in NWTM's new facility in Dayton, Nevada. From 2009 to 2016, customer stored bullion was located in both Nevada and in Washington.

### b. Erdmann raided the storage vaults to fulfill standard bullion orders

Beginning at least as early as 2011, Hansen and Erdmann used the bullion-storage program for their own purposes, namely to fulfill new standard bullion customer orders. Numerous former NWTM employees will testify at trial about the practice of using stored bullion to fulfill orders.

The government will introduce emails that show Erdmann directing Nevada employees to use bullion-storage metal to fulfill orders, in violation of NWTM's promises to provide customers secure storage. These emails call this practice "borrowing" or "pulling" from storage. Nevada-based bullion production employees, including John Rickey and Diane Hopkins, will testify that they were directed by Erdmann to use stored metal in this way. Former employees will also testify that, while some "borrowed" customer-owned bullion may have been replaced, it was clear that by 2015 there was significantly less customer-owned bullion in the Nevada vault.

While Erdmann was immediately responsible for fulfilling bullion orders, and directly ordered the theft from the vaults, Hansen was aware of this practice. In 2011, and again in 2015, Hansen also told two different in-house counsel, Catherine Hopkins and Greg Fullington, that he was aware of the practice of "borrowing" stored metals. Former employee Young will testify that he was concerned about the outstanding obligation to bullion-storage and bullion-lease customers and also told Hansen directly that it was "wrong to dip into" the storage and lease program. Hansen told Young that he had "no idea how to handle the company" and "just worry about your accounting stuff."

### c. Further evidence of fraud in the bullion-storage program

The defendants' intent to defraud is reinforced by the general lack of procedures followed to maintain the storage program. For example, after 2009, Hansen never conducted an inventory of stored metals despite the advice of several employees, including his in-house counsel in 2011 and 2015. The so-called stored metals were not tracked in NWTM's internal accounting system, but rather the balances were only tracked on separate spreadsheets. Former NWTM bullion lead Erin Robinson will testify

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  about her efforts after bankruptcy to audit accounting records of each storage customer to

2  reconcile the storage spreadsheets and accurately determine customer holdings.

### d.  Customer-owned bullion was missing from vaults

4  After bankruptcy, an inventory of NWTM's vaults revealed some customer-owned

5  bullion in Federal Way, some in Auburn, and some in Nevada that had any indication—

6  from post-it notes to serial numbers—of customer ownership. However, even after that

7  bullion had been identified and eventually returned to its owners, more than 50 storage

8  customers were missing metal and a total of roughly $4.9 million in customer-owned

9  stored bullion was missing. Witnesses will describe the inventory process, including their

10  largely unsuccessful efforts to locate and identify customer-owned metal.

## 3.  LEASE PROGRAM

### a.  The bullion-lease program promised interest and the ability to liquidate

14  Hansen also offered a "bullion lease" program, through which he recruited certain

15  customers to store their precious metals, or in some cases, their cash, with NWTM. Under

16  the lease program, NWTM could use the stored metals in its business in exchange for

17  paying interest to the lease customers and allowing short-term liquidation of the bullion-

18  lease customer's position. The government will offer Lease Agreements signed by

19  Hansen and his bullion-lease customers that stated:

- NWTM "shall pay Lessor three-and-a-half percent interest (3.50%) simple interest per annum in like-kind metal";

- On 30 days written notice, NWTM "shall ship Lessor's bullion to the last known address"; and

- "Lessor may liquidate [convert into cash] his or her leased bullion, in whole or in part, at any time by calling [NWTM] during business hours … [NWTM] shall pay Lessor [NWTM's] prevailing buy price for that same product, and payment shall be made to Lessor within thirty (30) days thereafter."

27  Lease customers, including Bill Hanson and Paula Pehl, will testify that Hansen

28  convinced them to lease their metal in part by assuring them it would be replenished right

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 12

away if it was used. These customers will testify that they believed, based on Hansen's representations and descriptions of the program, that their physical leased metal was securely stored when not in use. However, according to witness testimony and NWTM emails, Erdmann and other NWTM employees immediately used leased bullion to fulfill orders. For example, when Hansen convinced Ms. Pehl to lease her metal back to NWTM, rather than take delivery, Erdmann wrote to John Rickey "They decided to lease it to us, different from storage, *it's ours free and clear*" (emphasis added) and told Rickey she would "find it a home," i.e., an order that needed filling.

### b.  These bullion-lease promises were not kept

The interest payments were also a misrepresentation – there is no evidence that Hansen, Erdmann, or anyone at NWTM actually set aside bullion to make these promised interest payments. While lease statements were regularly mailed to customers, and these lease statements indicated the supposed tally of interest earned, those lease statements were not backed up with additional metal or money—in true Ponzi fashion, they were only worthless paper returns.

During the 2016 inventory, two 100-ounce silver bars that were leased from a bullion-lease customer in Nevada were found. These were rare silver bars and that is why the bars like were not used in production. No other leased bullion was found. The outstanding obligation to bullion-lease customers, including leased bullion and promised interest, is more than $5 million.

### 4.  OTHER BULLION TRANSACTIONS

### a.  Bullion sales and exchange customers

At Hansen's direction, NWTM also purchased bullion from customers and made bullion-for-bullion exchanges with customers, this time taking in metal and delaying delivery of payment or exchanged metal. But, as with standard bullion orders, these transactions were another example of luring customers to send NWTM assets and pushing of NWTM's return obligations as long as possible, or never fulfilling them. For example, in October 2015, Hansen received $1.8 million in gold bars from S.F. with the

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  agreement that he would exchange the bars for gold coins. Instead, Hansen sold the bars

2  for use in the NWTM business and for his personal use, and never completed the

3  exchange. Despite Hansen's representations to S.F. that his exchanged coins were ready

4  for delivery in February 2015, when the inventory of NWTM's vaults was completed

5  after bankruptcy, the coins were not found.

6  ### b.  Other evidence that Hansen and Erdmann ran NWTM as a fraud

7  NWTM's enterprise software, Epicor, was implemented in 2014, and managed

8  thousands of orders. Although the system was designed to track inventory and match that

9  inventory to an order, Hansen and Erdmann routinely inflated the inventory numbers.

10  Erdmann inflated the numbers of NWTM's most commonly sold products. When Young

11  complained and cut off Erdmann's access to Epicor, Hansen yelled at him and demanded

12  he reinstate her access. Young complained that doing so limited Epicor's functionality,

13  but Hansen replied that he wanted a system that he can "fudge."

14  The FBI recorded a series of conversations between Hansen and an NWTM

15  employee (a former FBI agent who worked as confidential human source, or "CHS") in

16  the fall of 2015. In these conversations, Hansen is clearly concerned that his business

17  activities are being investigated and he asks the CHS to get access to FBI files to see if

18  Hansen's former in-house counsel—who had advised Hansen that the bullion business

19  was operating as a fraud—had contacted the FBI about Hansen. Hansen even offered to

20  pay the CHS for the information.

21  Hansen's view that he is in complete control of all aspects of the business

22  continued even after bankruptcy. Hansen repeatedly told large creditors that they should

23  remain "loyal" to Hansen, because the loyal creditors will get paid back.

24  ### c.  Hansen and Erdmann used customer money for their own purposes

25  The evidence will demonstrate that, under Hansen's direction, NWTM used

26  customer money not for that customer's order, but for business and personal purposes.

27  While many fraud schemes result in the enrichment of the scheme's leaders, in this case,

28  Hansen primarily enriched himself by expanding his NWTM empire and keeping control

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 14

of what he called "the largest privately owned mint." Through the 2009-2016 timeframe, Hansen used customer money to expand the business (acquiring businesses in Nevada, Texas, and Hawaii), and to fund expensive lawsuits, among other things.

The evidence will also show that between March 2016 and June 2017, while NWTM was going through the bankruptcy process, Erdmann sold over $600,000 worth of gold, silver, and palladium, and platinum.  Most of the proceeds of Erdmann's post-bankruptcy precious metal sales were used to pay various lawyers. Erdmann attempted to avoid a paper trail for these transactions; with a few exceptions, she requested that the coin shops write checks directly to the law firms so that these transactions would not hit her account.

### III.    CHARGES AND ELEMENTS

The twenty-count Indictment charges Hansen and Erdmann with mail fraud and wire fraud.

### A.    Counts 1-10: Mail Fraud

Counts 1-10 charge Hansen and Erdmann with executing a scheme to defraud NWTM customers in violation of 18 U.S.C. § 1341. The government has proposed the Ninth Circuit's model instruction (Instruction 8.121) in its proposed jury instructions.

Mails were regularly used as part of the scheme. NWTM mailed regular statements to bullion-storage and bullion-lease customers describing their supposed metal holdings. Counts 1, 2, and 9 charge such mailed storage and lease statements. Each year, NWTM typically mailed a yearly invoice for storage fees to storage customers, who in turn sometimes paid those fees by mailed check. Counts 3 and 4 charge mailed storage invoices, and Count 5 charges a check mailed from a customer to pay fees for what she believed was secure storage. Standard bullion customers also often paid for their orders by mailing checks to NWTM for payment; Counts 6, 7, and 8 charge three such mailings. Finally, Count 10 charges the mailing of gold coins from a customer selling to NWTM for promised payment; that payment was not sent, nor was the gold returned.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

It is not necessary that the defendants personally mail the charged mailings. *United States v. Jones*, 712 F.2d 1316, 1320 (9th Cir. 1983). Rather, it is enough that the transmission was "incident to" an essential part of the scheme. *United States v. Eglash*, 813 F.3d 882, 886 (9th Cir. 2016) (affirming mail fraud conviction based on documents mailed to defendant by SSA in connection with his fraud scheme); *United States v. Brown*, 771 F.3d 1149, 1158 (9th Cir. 2014) (affirming mail fraud conviction based on documents mailed by the Bankruptcy Court). Each of the mailings charged was "incident to" Hansen and Erdmann's scheme to defraud NWTM's customers.

## B.   Counts 11-20: Wire Fraud

Counts 11 through 20 charge Hansen and Erdmann with wire fraud in violation of 18 U.S.C. § 1343. The scheme to defraud is identical to the scheme alleged in Counts 1 through 10, as are the elements, with wires used rather than mails. The government has proposed Ninth Circuit Model Instruction 8.124.

The wire fraud counts are based on e-mails from Hansen or NWTM or wire transfers from customers paying for metal that they ultimately never received. Count 11 charges an emailed statement of purportedly stored metal. Counts 12, 13, 19, and 20 charge NWTM emails to customers that falsely represented an initial delivery date or a second delivery date.[4] Counts 14 and 16 charge wired payments to NWTM for gold that was never delivered to the customers. Count 15 charges an email from Hansen to S.F. regarding the exchange of his gold bars for coins; that transaction was not completed.

Emails are wire communications for purpose of the wire fraud statute. *See, e.g., United States v. Selby*, 557 F.3d 968, 979 (9th Cir. 2009). Though the Ninth Circuit is not among them, many circuits explicitly instruct the jury on this fact. *See, e.g.,* Third Circuit Pattern Jury Instructions Criminal § 6.18.1343 at 488 (2009) ("The use of the Internet to send a message, such as an e-mail, ... may constitute a wire transmission in interstate commerce."); Fifth Circuit Pattern Jury Instructions Criminal § 2.57 Note at 296 (2015)

---

[4] The government will move to dismiss Counts 17 and 18.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 16

(citing *United States v. Barraza*, 655 F.3d 375, 383) (5th Cir. 2011) (holding that an e-mail was sufficient to sustain a wire fraud conviction); Seventh Circuit Pattern Jury Instructions Criminal at 508 (2012) (stating "e-mails ... constitute transmission by means of wire communication"); Eighth Circuit Pattern Jury Instructions Criminal § 6.18.1343 at 452 (2018) (listing e-mail as an example of interstate wire communication). Emails that travel from a sender in one state to a recipient in another necessarily travel interstate.

As with the charged mailings, the government need not show that the defendants personally completed the wirings at issue, only that they were incident to an essential part of the scheme. *See* comment to Ninth Circuit Model Instruction 8.124 (noting that "the only difference between mail fraud and wire fraud is that the former involves the use of the mails and the latter involves the use of wire . . . communications in interstate commerce").

## IV.    EVIDENTIARY ISSUES

Following is a discussion of evidentiary issues relevant to the government's case:

**A.    Pretrial Motions and Motions in Limine**

The parties have filed a number of pretrial motions and motions in limine regarding what evidence may be presented at trial, and the Court has ruled on those motions. Dkts. 213, 214, 254, 255, 256, 258, and 268. The government will follow those rulings and instruct its witnesses to do so.

**B.    Business and Public Records**

The government will offer records of regularly conducted activities of businesses and public agencies.

### 1.    Business Records

The government will introduce business records kept and maintained by NWTM, as well as records from banks and other metal dealers with whom NWTM and/or defendants did business. These records are admissible pursuant to Rule 803(6), which allows for admission of a record if it is made at or near the time of the events set forth therein, by a person with knowledge, and is kept in the course of regularly-conducted

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

activity of a business or other organization, if it is the regular practice of the organization to make the record. Fed. R. Evid. 803(6). Incompleteness, ambiguities, and inaccuracies in records go to the weight to be given the evidence, not to its admissibility. *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988).

Any person familiar with the record-keeping practices of the business is a sufficient foundational witness. Personal knowledge of the document is not required and does not affect its admissibility. *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (the phrase "other qualified witness" is broadly interpreted to require "only that the witness understand the record-keeping system" at the particular organization). Furthermore, a record generated by a third party and received and relied upon in the ordinary course, such as an invoice, becomes a business record of the company relying upon it. *Childs*, 5 F.3d at 1333-34; *see United States v. Jawara*, 474 F.3d 565, 585 (9th Cir. 2007) ("[W]e would have no trouble concluding that a college in the United States was a proper custodian of its' students' SAT results, even though the SAT results were actually prepared by another entity"). The government need not show the records are accurate; it needs only to show the records are kept in a regular manner and are relied upon for the management and operation of the business. *Johnson v. United States*, 325 F.2d 709, 711 (1st Cir. 1963). In determining whether these foundational facts have been established, the court may consider hearsay and other evidence not admissible at trial. Fed. R. Evid. 104(a).

The government intends to authenticate certain of these business records by offering Federal Rule of Evidence 902(11) certifications rather than live testimony. Rule 902(11) provides that a party may authenticate a business record through a signed certification of records custodian if the proponent of the evidence gives the adverse party adequate notice of its intent to offer the record. The government has provided (or will provide) all 902(11)s to the defense.

### 2.     Public Records

Rule 803(8) provides an exception to the hearsay rule for public records from a

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  public agency or office, relating to an activity of the office. "Records kept . . . [b]y public

2  agencies may be admissible under the business records exception, Fed. R. Evid. 803(6),

3  as well as under the public records exception, Fed. R. Evid. 803(8)." *United States v.*

4  *Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986) (internal citations omitted).

5      The government will seek to introduce a certified copy of NWTM's 2008 Consent

6  Decree with the Attorney General's Office. Public records are self-authenticating and do

7  not require testimony of a live witness when there are either: (1) presented with a

8  certification a custodian of records pursuant to Rule 902(11); or (2) certified as correct by

9  an official. Fed. R. Evid. 902(4).

10 **C.    Email Evidence**

11     The government will seek to admit a number of emails, including those sent to or

12 from the defendants, other NWTM employees, or NWTM victims.

13         **1.    Authentication of Emails**

14     Authentication of electronic evidence, including emails, is based on the same

15 principles as the authentication of any other evidence. *United States v. Tank*, 200 F.3d

16 627, 630 (9th Cir. 2000). The foundational "requirement of authentication or

17 identification as a condition precedent to admissibility is satisfied by evidence sufficient

18 to support a finding that the matter in question is what its proponent claims." *Id., quoting*

19 Fed. R. Evid. 901(a). "The government need only make a prima facie showing of

20 authenticity, as the rule requires only that the court admit evidence if sufficient proof has

21 been introduced so that a reasonable juror could find in favor of authenticity or

22 identification." *Tank*, 200 F.3d at 631. Once a prima facie showing of authenticity has

23 been made, any questions about accuracy or completeness go to the weight the factfinder

24 should give to the evidence, and not to admissibility. *Id.* at 630. The burden for

25 authentication is not high. *See United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009

26 ("The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is

27 required.").

28

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 19

1    In making its determination, "the court is not bound by evidence rules, except

2    those on privilege." Fed. R. Evid. 104(a). Authenticity may be shown by "the appearance,

3    contents, substance, internal patterns or other distinctive characteristics of the item, taken

4    together with all the circumstances." Fed. R. Evid 901(b)(4); *see United States v. Jones*,

5    107 F.3d 1147, 1150, (6th Cir. 1997) ("[A] document…may be shown to have emanated

6    from a particular person by virtue of its disclosing knowledge of facts known peculiarly

7    to him…") (citing Fed. R. Evid. 901(b)(4), Advisory Committee Notes, Example (4)); *see*

8    *also Alexander Dawson v. N.L.R.B.*, 586 F.2d 1300, 1302 (9th Cir. 1978) ("The content

9    of a document, when considered with the circumstances surrounding its discovery, is an

10   adequate basis for a ruling admitting it into evidence.") (citation omitted).

11   The emails offered by the government will primarily be authenticated by a witness

12   who will testify that he or she sent or received the email—testimony by a person with

13   personal knowledge under Rule 901(b)(1). These witnesses will include both former

14   NWTM employees, as well as victim witnesses who will testify about the email

15   communications they received from NWTM about their bullion orders. In certain, limited

16   cases, the government may authenticate NWTM through a former employee witness who

17   was not the sender or recipient, but has personal knowledge of the NWTM email system,

18   the appearance, contents, and distinctive characteristics of company emails, including the

19   email addresses of the senders and recipients.

20   Beyond testimony of a person with knowledge, another authentication method

21   under Rule 901 is the evidence's "distinctive characteristics and the like," including

22   "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics,

23   taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4).  Most of the emails to

24   be offered indicate on their face that they are sent from NWTM employees, including

25   defendants.  This distinctive characteristics of those emails, including senders and

26   recipients and their addresses, is sufficient for authentication. *See United States v.*

27   *Safavian*, 435 F. Supp. 2d 36 (D.C. Cir. 2006) (declarant's email address, names of

28   sender and recipient all sufficient to authenticate emails). The contents of the emails,

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

including the signature and salutation, also authenticate them as being from the

defendant, as they contain discussion of particular precious metals orders, fulfillment

instructions, and other issues that connect them to defendants and their business practices.

3.   **Admissibility of Emails**

The emails the government expects to offer fall into two categories, neither of

which is precluded by the rule against hearsay. First, the government will introduce

emails that are not offered for the proof of the matter asserted, but instead to show notice

to the recipient, show the effect a statement had on the reader and provide context for

actions taken in response, or simply establish that the communication was sent, without

regard to the truth of the statements contained within. These communications are not

hearsay. Fed. R. Evid. 801(c). *See also, e.g., United States v. Kirk*, 844.F.2d 660, 663 (9th

Cir. 1988) ("[S]tatements of salespersons misrepresenting the program were admissible

to prove that the misrepresentations were made, not to prove the truth of what the

salespersons stated.") These non-hearsay communications include both internal and

external communications of NWTM and its former employees. For example, the

government will introduce emails from customer service representatives to Defendant

Erdmann relating that a particular customer is threatening to file a complaint and asking

if she could get the order out faster. Such an email would be offered not for the truth of

whether the customer really had made such a threat, but for showing notice to Erdmann

of the reported threat and request for faster shipping. Sometimes these requests include a

response from Erdmann (also not hearsay, as described below), sometimes they do not,

and are offered to explain the sender's action. The government will also offer email

communications sent to NWTM customers regarding shipping dates, delays, or other

explanations of the customer's order. Again, these communications are not offered for

their truth—indeed, the crux of the defendants' scheme was that these repeated

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

representations to customers were *not* true—but for some other purpose, such as to show that they were sent, to explain the effect on the reader or the reader's actions in response.[5]

The second category of non-hearsay emails are those sent by the defendants. As discussed below, statements of the defendants—whether oral or written—are not hearsay. Fed. R Evid. 801(d)(2). The government will offer a number of Hansen and Erdmann's emails. These include responses to email chains where the entire chain is needed for context and is generally not offered for the truth of the other emails within the chain in any event (for example, if a bullion production employee emails Erdmann asking "Pull [metal to fill an order] from storage or no?" and Erdmann responds "yes").

## D. Statements of the Defendants

The government expects to offer a number of written and oral statements from the defendants at trial. These statements are not hearsay. *See* Fed. R. Evid. 801(d)(2).  As described above, the government will offer defendants' own email communications as non-hearsay statements of party opponents, as well as witness testimony about statements made by the defendants. The government may also offer transcripts of testimony made by the defendants during depositions or hearings in prior legal proceedings[6] and audio recordings of conversations involving Hansen. Additionally, writings signed by the defendants, including the Consent Decree and storage and lease agreements with customers, are likewise statements of the defendants and not hearsay. *See, e.g., United States v. Magbaleta*, 234 Fed.Appx. 718, 719 (9th Cir. 2007).

The defendants may not introduce their own statements through the testimony of another witness. Although the United States is permitted to introduce such statements through the testimony of the witness pursuant to Federal Rule of Evidence 801(d)(2), that rule is unavailable to a defendant since he is the proponent of the evidence and, where he

---

[5] With the exception of those provided by victims to law enforcement, the emails to be offered by the government are business records of NWTM, retrieved from NWTM's computers or servers and provided to law enforcement. To the extent these emails do contain hearsay, they are admissible pursuant to Fed. R. Evid. 803(6).

[6] Pursuant to the Court's rulings on the parties' motions in limine, these transcripts have been redacted where instructed by the Court in accordance with *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny.

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  seeks to introduce it, it is not offered against him. *See United States v. Ortega*, 203 F.3d
2  675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).
3  Under Rule 801(d)(2), a statement by a party is not hearsay only when it is being offered
4  against the party that made the statement, not when it is offered on the declarant's behalf.
5  Indeed, even where the United States elicits the inculpatory portion of defendant's
6  statement from a witness, on cross-examination, the defendant is not entitled to elicit the
7  exculpatory portion. *See Ortega*, 203 F.3d at 682. The rule of completeness (Fed. R.
8  Evid. 106) has no place in this analysis since it applies only to written or recorded
9  statements. *Id.*

10  **E.      Admission of Co-Conspirator Statements**

11        The government intends to introduce statements made by Hansen as evidence
12  against Erdmann and vice versa. These include emails like those referenced above, where
13  Erdmann instructs NWTM employees working in the Nevada vault to use customer-
14  owned metal from storage to fulfill bullion orders for other customers. As an example,
15  even if Hansen were not aware of that particular communication, the fact that it was made
16  in furtherance of defendants' joint scheme means it is admissible against both as a non-
17  hearsay coconspirator statement, without a limiting instruction from the Court.

18        Under Federal Rule of Evidence 801(d)(2)(E), "a statement is not hearsay if . . .
19  [t]he statement is offered against a party and is . . . a statement by a coconspirator of a
20  party during the course and in furtherance of the conspiracy." There is no requirement
21  that a statement by a co-conspirator be made to another co-conspirator for the statement
22  to be admissible. *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993).  *See*
23  *also United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)
24  ("Just as acts and statements of co-conspirators are admissible against other conspirators,
25  so too are the statements and acts of co-participants in a scheme to defraud admissible
26  against other participants.").

27
28

1    "An accused's knowledge of and participation in an alleged conspiracy are

2    preliminary facts that must be established before extrajudicial statements of a co-

3    conspirator can be introduced into evidence." *United States v. Silverman*, 861 F.2d 571,

4    576 (9th Cir. 1988). "Although co-conspirator hearsay statements may be used to prove

5    the preliminary facts of the conspiracy and the defendant's involvement in it, the

6    Government cannot rely solely on those statements: there must be evidence, beyond the

7    statements, to demonstrate by a preponderance of the evidence the conspiracy and the

8    defendant's connection to it." *United States v. Tamez*, 941 F.2d 770, 774-775 (9th Cir.

9    1991).

10    The government will establish that Hansen and Erdmann acted jointly in

11    defrauding standard bullion, bullion-storage, and bullion-lease customers. Both made, or

12    directed employees to make, representations to customers about when metal would be

13    available or shipped, when refunds, would be paid, and more that they knew were not

14    true. They both made determinations about which orders to prioritize for fulfillment—in

15    contrast to their represented policies—and how and when to fulfill orders that were

16    already beyond their "drop dead" dates. With the exception of very few isolated

17    episodes—such as Hansen's effort to get the CHS to access FBI files—the evidence of

18    the charged scheme is equally admissible against each, and their statements should

19    likewise be admissible against one another as co-conspirator statements.

20    **F.    Intent to Repay is Not a Defense**

21    The defendants should not be permitted to implicitly or explicitly assert through

22    examination or argument that an intent to repay victims or replace metal taken from

23    storage is a defense to the charges. *See United States v. Miller*, 9053 F.3d 1095, 1103 (9th

24    Cir. 2020), *citing United States v. Hamilton*, 499, F.3d 734, 736 (7th Cir. 2007) ("If you

25    embezzle from your employer you are not excused just because you had an honest

26    intention of replacing the money, maybe with interest ....").

27    As an example, in both 2011 and 2015, defendant Hansen was confronted by his

28    in-house counsel about the use of customer-owned metal from storage to fulfill

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

outstanding bullion orders. In both cases, Hansen said that while he was aware of the practice, he claimed the metal was, or would be, replaced. If defense implies or argues that defendants intended or expected to repay victims, the government may ask for a jury instruction to allay any juror confusion about the existence of such a defense to the fraud charges.

## G.   Summary Charts

Three types of summaries and charts are typically used in criminal cases: (1) summaries of voluminous records which may be admissible pursuant to Fed. R. Evid. 1006; (2) summaries created by a summary witness which may be admitted pursuant to Fed. R. Evid. 611(a); and (3) demonstratives or pedagogical charts that are used as testimonial aids, but which are not themselves introduced into evidence. The government may seek to use summaries and charts falling within all three categories.

### 1.   Fed. R. Evid. 1006 Summary Schedules

Summaries and charts of voluminous records are used to present evidence of records so voluminous as to be impractical or impossible to actually bring into court and use during trial. *See* Fed. R. Evid. 1006; *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use of summaries when the volume of documents is so large as to make their use impractical or impossible."). The underlying records used to prepare Rule 1006 summaries are not usually admitted into evidence although they can be. Proponents must lay a proper foundation for admissibility of underlying records. *See United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989); *United States v. Meyers*, 847 F.2d 1408, 1411 (9th Cir. 1988). The substantive content must be authenticated, but that may be done by the summary witness, if the witness has reviewed the underlying evidence. Fed. R. Evid. 901; *United States v. Soulard*, 730 F. 2d 1291, 1299 (9th Cir. 1984).

Rule 1006 allows for the summaries of voluminous materials to be admissible and used as substantive evidence, rather than solely as demonstrative evidence. *See Meyers*, 847 F.2d at 1411-12 (admitting summary of otherwise admissible evidence as substantive

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  evidence where the summary contributed to the clarity of the presentation); *see United*
2  *States v. Baker*, 10 F.3d 1374, 1411 (9th Cir. 1993) ("[T]his Circuit has often allowed the
3  use of summary charts and summary witness testimony based on testimonial evidence
4  (most commonly in tax cases)"); *United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000);
5  *United States v. Wood*, 943 F.2d 1049, 1053 (9th Cir. 1991).

6      The government will offer into evidence summaries of voluminous NWTM data
7  and records, including purchase, order, and shipping records in this case, NWTM bank
8  account and cash records, and customer lease and storage holdings. These summaries will
9  be offered through Bryan Snead, an FBI forensic accountant who reviewed and
10  summarized these records, or an FBI case agent.

11      The records on which the summaries are based are routinely kept in the normal
12  course of business and fall within the hearsay exception of Rule 803(6). The underlying
13  records have been available to the defense since the beginning of this case.

14      **2.      Fed. R. Evid. 611(a) Summary Testimony and Schedules**

15      Federal Rule of Evidence 611, addressing the Mode and Order of the Interrogation
16  of Witnesses, gives the Court great discretion in what a witness may use during testimony
17  so as to "(1) make the presentation effective for the ascertainment of the truth, [and] (2)
18  avoid needless consumption of time." Fed. R. Evid. 611(a); *see United States v. Gardner*,
19  611 F.2d 770,776 (9th Cir. 1980) (summary chart admissible in tax evasion case under
20  Rule 611(a)); *United States v. Paulino*, 935 F.2d 739, 752-54 (6th Cir. 1991) (testimony
21  of non-expert summary witness regarding cash generated from cocaine sales in drug
22  conspiracy case admissible under Rule 611(a) where trial court gave limiting instruction
23  and defense had full opportunity to cross-examine); *United States v. Scales*, 594 F.2d
24  558, 563-64 (6th Cir.1979) (summaries of testimonial evidence designed "to aid the jury
25  in its examination of the evidence already admitted" do not come within Rule 1006, but
26  are authorized by Rule 611(a)); *see also* 5 Jack B. Weinstein and Margaret A. Berger,
27  Weinstein's Evidence, at ¶ 1006[03] (summary "prepared by a witness from his own
28  knowledge to assist the jury in understanding or remembering a mass of details is

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  admissible, not under Rule 1006, but under such general principles of good sense as are

2  embodied in Rule 611(a)").

3      In the event the summaries described in the above section are not considered to

4  summarize voluminous records under Rule 1006, they should be admissible under Rule

5  611. Such summaries themselves can also be properly admitted into evidence. *See, e.g.,*

6  *Shirley*, 884 F.2d at 1133-34. In *Shirley*, the summary expert witness compiled a

7  summary of telephone records based on information already introduced into evidence.

8  "Summary evidence . . ., 'can help the jury organize and evaluate evidence which is

9  factually complex and fragmentally revealed in the testimony of the multitude of

10  witnesses.'" *Shirley*, 884 F.2d at 1133-34, *citing United States v. Lemire*, 720 F.2d 1327,

11  1348 (D.C. Cir. 1983); *see also United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir.

12  1988) (properly admitting chart detailing long distance calls made by various co-

13  conspirators); *United States v. Marchini*, 479 U.S. 1085 (1987) (admitting summary

14  calculations of IRS agent where he was cross-examined on his testimony).

15      **3.      Demonstrative Charts**

16      The government also intends to use various demonstrative charts during its

17  opening statement, examination of witnesses, and in closing argument. Such charts

18  include, for example, diagrams showing the flow of money and metal to and from

19  standard bullion customers, or summaries of a particular victim's transactions and

20  communications. The government does not intend to offer these charts into evidence.

21  Courts have repeatedly allowed use of charts similar to those the United States intends to

22  use in this case. *See, e.g., United States v. Scales*, 594 F.2d 558, 561-562 (6th Cir. 1979)

23  (summary of indictment); *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985)

24  (simple flow charts tracing the defendant's use of loan proceeds).

25  **H.      Transcripts of Recorded Conversations**

26      The government will offer portions of recordings of conversations between

27  Hansen and NWTM employee Russ Wilson in which Hansen urged Wilson to investigate

28  possible reports to the FBI and offered to pay him in bullion for the service. The

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

government has prepared transcripts of the conversations to show the jurors while they listen to the recordings. The government has proposed Ninth Circuit Model Instruction 2.6, which instructs the jury that the recordings themselves are the evidence, and the transcripts only a guide.

The Ninth Circuit has approved of the use of transcripts of properly admitted recordings to aid the jury in understanding the recordings. *United States v. Turner*, 528 F.2d 143, 167-68 (9th Cir. 1975). While the transcripts should not be sent back to the jury room, the transcripts may be provided to the jury if they request to have the recordings replayed during deliberations. Because the jury is instructed that the recordings control, the court is not required to review the transcripts to determine their accuracy. *United States v. Tisor*, 96 F.3d 370, 377 (9th Cir. 1996).

Certain portions of the recordings may not be audible. This does not affect the admissibility of the recordings. Even where portions of a recording are unintelligible, "[a] recorded conversation is generally admissible unless the unintelligible parts are so substantial that the recordings as a whole is untrustworthy." *United States v. Lane*, 514 F.2d 22, 97 (9th Cir. 1975). Accordingly, the Court may simply disregard any portions that it determines to be inaudible.

## V.    EXCLUSION OF WITNESSES

Pursuant to Rule 615 of the Federal Rules of Evidence, the government respectfully requests that witnesses be excluded from the courtroom, with the exception of the case agent. *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987) (case agent permitted to remain in court through trial as a representative of the government); *see also United States v. Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989) (same).

## VI.    REBUTTAL WITNESSES

The government reserves the right to call any rebuttal witnesses depending on the defense case.

//

//

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## VII.   CONCLUSION

2       This Trial Brief is intended to familiarize the Court with the government's case

3   and evidentiary issues related to the trial presentation. The government will supplement

4   this brief as necessary if additional issues arise.

5       DATED this 21st day of June, 2021.

6                                           Respectfully submitted,

7                                           TESSA M. GORMAN
                                            Acting United States Attorney
8

9                                           *s/ Benjamin T. Diggs*
10                                          BENJAMIN T. DIGGS
                                            BRIAN WERNER
11                                          Assistant United States Attorneys
                                            Western District of Washington
12                                          700 Stewart Street, Suite 5220
13                                          Seattle, Washington 98101-1271

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Hansen and Erdmann* - CR18-092 RAJ
TRIAL BRIEF- Page 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970